Phillip SCHAFFER and
David W. Stiefel,

v.

**BENEFIT PLAN OF EXXON COR-PORATION and Participating Affiliates.**

No. CIV. A. G–00–241.

United States District Court,
S.D. Texas,
Galveston Division.

July 11, 2001.

Blair Bernard Brininger, III, Attorney at Law, Houston, TX, for plaintiffs.

William Scott Helfand, Magenheim Bateman et al, Houston, TX, for defendants.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

KENT, District Judge.

Plaintiffs bring this action pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq., challenging their denial of benefits. Now before the Court are Plaintiffs' and Defendant's competing Motions for Summary Judgment. For the reasons stated below, Defendant's Motion for Summary Judgment is **GRANTED** and Plaintiffs' Motions are **DENIED**. Consequently, Plaintiffs' claims are **DISMISSED WITH PREJUDICE** in their entirety.

### I. BACKGROUND

Plaintiffs are Phillip W. Schaffer ("Schaffer") and David W. Stiefel ("Stiefel"). Both are former employees of Exxon Company U.S.A. ("Exxon"), who injured their elbows on-the-job, and who were subsequently denied disability benefits under the Benefit Plan of Exxon Corporation ("Plan"). Defendant moved to sever and transfer the claims of Plaintiff Stiefel, but the Court denied the request in an Order dated December 19, 2000.

#### A. *Plaintiff Schaffer*

Plaintiff Schaffer began working for Exxon as a field mechanic craftsman in 1974 and became a participant in the Plan shortly thereafter. He suffered an on-the-

job injury to his elbow on October 19, 1993.

Defendant's version of the subsequent events are as follows. Plaintiff received workers' compensation and temporary industrial disability benefits from November of 1993 until October of 1996. He then received long-term disability benefits from October of 1996 until April of 1997. In May of 1997, Dr. Richard O. Dockins, Exxon's Medicine and Environmental Health Department Director, determined that Plaintiff had a treatable medical condition and could return to a structured work transition program, . or work-hardening program. Plaintiff refused to participate until he was seen by his doctor. His doctor had been Dr. James Pyle in Baytown, Texas, but at this time Plaintiff changed to Dr. Gerard Gable in Houston. Dr. Gable prescribed a work-hardening program for Plaintiff, and Plaintiff began the program on June 2, 1997. On June 11, 1997, Plaintiff reported that he had injured his back on June 6, 1997 while participating in the program. Dr. Dockins examined Plaintiff the next day and found "no evidence of any significant musculoskeletal injury." Dr. Dockins concluded that Plaintiff's refusal to participate was due to lack of motivation and "not strictly medical issues." Plaintiff nevertheless continued to refuse to participate in the program.

Exxon then placed Plaintiff on Family Medical Leave on June 23, 1997. On September 12, 1997, Plaintiff was informed that his claim for medical retirement benefits had been denied. Plaintiff was nevertheless granted a fourteen week extension of his Family Leave so he could identify and participate in a work transition program. Plaintiff did not respond.

In March of 1998, Exxon offered to perform a voluntary medical exam on Plaintiff, let Plaintiff update his medical records, and let him return to work. Again,

Plaintiff did not respond to the offer. Thus, on September 23, 1998, Exxon terminated Plaintiff's employment. Again, there was no response from Plaintiff until approximately ten months later, on July 25, 1999, when Plaintiff submitted additional medical evidence and demanded that Defendant "pay his benefits."

Plaintiff offers the following version of the events. He alleges that his injury has made him incapable of engaging in any type of gainful employment from November 1, 1993 to the present. In May of 1994, Plaintiff's personal physician, Dr. Pyle, diagnosed Plaintiff with "Chronic Lateral Humeral Epicondylitis" or as it is commonly referred to "tennis elbow." Dr. Pyle placed him on restrictions of "no lifting, pulling, pushing over 10 lbs, no climbing ladders, no excessive use of wrists, no excessive extension position of elbows." In October of that year, Dr. Pyle determined that Plaintiff would possibly need surgery. In November of 1995, Exxon placed similar restrictions on Plaintiff.

In August of 1996, a review committee recommended that the Plan grant Plaintiff disability benefits. Defendant thereafter prepared a termination checklist for Plaintiff. In December of 1996, Defendant's doctor, Dr. Myron Harrison determined that Plaintiff was partly disabled.

Then, "inexplicably" the Defendant decided that Plaintiff was not following his doctor's orders and ordered his return to work. Only after deciding that Plaintiff had a treatable medical condition did Defendant ask Dr. Dockins to support the decision. Defendant allegedly stated that it was "not planning to disability retire Plaintiff ... [but] to bring him back to work or deny his benefits."

Plaintiff injured his back during the work-transitioning program. Subsequently, Dr. Donald T. Lazaraz diagnosed Plain-

tiff with "Rheumatoid Spondylitis of the Lumbar Spine" which affected his spine and joints, both shoulders, and elbows. Dr. Lazaraz opined that Plaintiff was not capable of returning to work and was a candidate for retirement. Furthermore, Dr. Lazaraz believed that surgery would only worsen symptoms. Plaintiff had a positive result from an arthritis blood test. Approximately one year later, Dr. Lazaraz found that Plaintiff had a ten percent impairment for each elbow weakness, equal to a nineteen percent impairment using the combined value system.

Plaintiff submitted additional documents to Defendants on July 25, 1999. Defendant Plan agreed to review the documents, but nonetheless refused to reverse the denial of benefits.

### B. *Plaintiff Stiefel*

Plaintiff Stiefel began working for Exxon as a mechanical draftsman in 1977 and became a participant in the Plan shortly thereafter. He suffered an on-the-job injury to his elbow in 1995.

Defendant offers the following version of subsequent events. After his injury, Plaintiff was diagnosed with carpal tunnel syndrome and underwent surgery in August of 1996. In March of 1997, Plaintiff applied for Special Disability benefits, which were denied because it was not clear that Plaintiff was likely to recover within twenty-four months.

In December of 1997, Dr. Kenneth R. Kemp, Jr. determined that Plaintiff was at maximum medical improvement as of July 31, 1997. Dr. Kemp found that Plaintiff had a five percent impairment in his right wrist, a two percent impairment in the left upper extremity, and a seven percent impairment in the right upper extremity for a total of nine percent whole person impairment.

In October of 1998, Exxon certified Plaintiff as being able to return to work and ordered him to do so by December 10, 1998. When Plaintiff did not return by that date, or provide additional medical information, Exxon considered him as having resigned.

Plaintiff offers the following version of the events. Plaintiff was diagnosed with carpal tunnel syndrome, for which he was treated with a wrist brace for two months, but his elbow pain continued to intensify. In December of 1995, Plaintiff was further diagnosed with "cubital tunnel syndrome" in the right elbow and "hyper-extension valgus overload syndrome" in the right elbow. Then in February of the following year, Plaintiff was diagnosed with "bilateral neuropathy" and "bilateral median neuropathy," and delayed relaxation of reflexes. Plaintiff was recommended to undergo surgeries to correct the polyneuropathy. In July of 1997, Dr. Lazaraz diagnosed Plaintiff with Rheumatoid arthritis of the spine, aggravated by shoulder and elbow musculoskeletal strain and "post-operative ulnar transfer-carpal tunnel decompression."

Plaintiff claims that Defendant denied his Medical Retirement benefits stating no warranted grounds. Plaintiff appealed this decision. The appeal was denied because Plaintiff was still an employee. Thereafter, Plaintiff was evaluated by a Dr. Eric Scheffey who determined that he was not a candidate for gainful employment and outlined his work restrictions. Dr. Scheffey stated that Plaintiff would not be able to maintain attention for a period of two hour segments and that Plaintiff's medication interfered with Plaintiff's coordination, concentration, and ability to remain alert. Plaintiff appealed his denial of medical retirement and sent additional documents to Defendant. In the meantime, on March 23, 1999, Plaintiff received

a fully favorable decision for benefits retroactive to December 6, 1995 from the Social Security Administration. Defendant was informed of this decision. On May 24, 1999, Defendant denied Plaintiff's appeal for medical retirement benefits claiming that he was not terminated for disability. Plaintiff thereafter sent more documents to Defendant. He was informed that the Plan would review his claim, but the appeal was ultimately denied again on November 19, 1999.

## II. STANDARD OF REVIEW

■■■ Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When ruling on a motion for summary judgment the evidence is viewed through "the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Generally, "a denial of benefits challenged under [ERISA][1] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary *discretionary authority to determine eligibility for benefits or to construe the terms of the plan.*" *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989) (emphasis added). If discretion is given in the Plan either to determine eligi-

bility or to construe its terms, the standard of review is the more lenient "abuse of discretion." *See id.* Plaintiffs dispute whether the plan gives the administrator discretion. Nevertheless, they concede that the issue is moot because only the Plan Administrator's factual determinations are at issue in this case, and such are reviewed for abuse of discretion regardless of the Plan's language. *See Pierre v. Connecticut Gen. Life Ins. Co.,* 932 F.2d 1552, 1558 (5th Cir.1991) (holding that an abuse of discretion standard of review, rather than de novo review, applies to factual determinations made in claim denials under ERISA plans). The Court also notes that the decision of whether an abuse of discretion has occurred is based upon information known to the administrator at the time he made the decision. *See Salley v. E.I. DuPont de Nemours & Co.,* 966 F.2d 1011, 1015 (5th Cir.1992).

Plaintiffs ask the Court to eschew *Pierce* and its progeny and instead apply *de novo* review to the factual determinations made by the Plan Administrator. They argue that "most courts" have refused to follow *Pierce,* citing decisions of the United States Courts of Appeal for the Third and Seventh Circuit. *See Plaintiff Schaffer's Mot. for Summ. J.,* at 11. Nevertheless, *Pierce* is the law in the Fifth Circuit, and the Court cannot refuse to follow it on the ground that a conflict may exist on the issue at the Court of Appeals level. As this Court's beloved predecessor, the late

---

1. ERISA was enacted "to promote the interests of employees and their beneficiaries in employee benefit plans," *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983), and "to protect contractually defined benefits," *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 148, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1985). *See generally* 29 U.S.C. § 1001 (setting forth congressional findings and declarations of policy regarding ERISA). The parties agree that the Plan at issue is an employee welfare benefit plan covered by ERISA. ERISA § 1132(a)(1)(B) provides that "[a] civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

Honorable Hugh Gibson, once put it, "[t]he Court begins with some fundamental concepts that should be common knowledge to the attorneys. First, this Court is located within the Fifth Circuit and, absent controlling or relevant decisions from the Supreme Court, is subject to the Fifth Circuit's interpretations of the law." *Garg v. Narron*, 710 F.Supp. 1116, 1117 (S.D.Tex. 1989) (Gibson, J.). Plaintiffs are of course perfectly free upon appeal to seek *en banc* treatment of the issue before the Fifth Circuit.

■ In evaluating Plaintiffs' claims, the Court remains mindful of the Fifth Circuit's recent admonition that if the Plan Administrator has a conflict of interest, deference to the discretionary standard should be adjusted depending upon the nature of the conflict. *See Vega v. National Life Ins. Servs., Inc.*, 188 F.3d 287, 295 (5th Cir.1999) (en banc). Under this approach, the "court always applies the abuse of discretion standard, but gives less deference to the administrator in proportion to the administrator's apparent conflict." *Id.* at 296. Thus, "[t]he greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard will be." *Id.* at 297. Plaintiffs argue that a conflict of interest exists because the Plan is self-funded. To support their assertion, Plaintiffs point to a section entitled "Eligibility, Vesting, and Cost" of the Plan Brochure. *Plaintiff Schaffer's Resp. to Def.'s Mot. for Summ. J. Ex. A, Plan Brochure, at 275.* This section states that employees are not required to make contributions to the Plan. The key question, however, is whether the same entity both "insures and administers the plan." *Vega*, 188 F.3d at 295. The fact that employees do not have to make contributions to the Plan does not mean that the Plan is self-funded in this sense. Moreover, even if the same entity does in fact insure and administer the Plan, this standing alone would only slightly reduce the level of deference given to the Plan administrator. *See Id.* at 300 (holding that in such a situation, the plan administrator decision is reviewed "with only a modicum less deference."); *Dew v. Metropolitan Life Ins. Co.*, 69 F.Supp.2d 898, 902 (S.D.Tex.1999). Plaintiffs have not introduced any additional evidence of conflict.

## III. ANALYSIS

■ Generally, application of the abuse-of-discretion standard is a two-step process. *See Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 637 (5th Cir.1992). This procedure requires the Court first to determine the legally correct interpretation of the Plan and then to examine whether the administrator applied the same. If the administrator failed to apply a legally correct interpretation of the Plan, the Court then determines whether the administrator's actions constituted an abuse of discretion. *See id.* When determining the legally correct interpretation of the Plan, the Court considers:

(1) whether the administrator has given the plan a uniform construction,

(2) whether the interpretation is consistent with a fair reading of the plan, and

(3) any unanticipated costs resulting from different interpretations of the plan.

*Id.* at 638 (citing *Jordan v. Cameron Iron Works, Inc.*, 900 F.2d 53, 56 (5th Cir. 1990)).

■ If the administrator has applied a legally correct interpretation of the Plan, then no further inquiry is required. *See, e.g., Chevron Chemical Co.*, 47 F.3d at 146; *Haubold v. Intermedics, Inc.*, 11 F.3d 1333, 1341 (5th Cir.1994). However, if the Court finds the administrator's interpretation legally incorrect, it must then evaluate whether that interpretation constituted an

abuse of discretion. In conducting this analysis, the Court considers:

(1) the internal consistency of the plan under the administrator's interpretation,

(2) any relevant regulations formulated by the appropriate administrative agencies, and

(3) the factual background of the determination and any inferences of lack of good faith.

*Wildbur,* 974 F.2d at 638 (citing *Batchelor v. International Brotherhood of Elec. Workers Local 861 Pension and Retirement Fund,* 877 F.2d 441, 445–48 (5th Cir.1989)).

 If a benefits denial is supported by substantial evidence and is not erroneous as a matter of law, it is not arbitrary nor capricious, and therefore is not an abuse of discretion. *See Wildbur,* 974 F.2d at 637 n. 12.[2] Substantial evidence is " ' "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ' " *Girling Health Care, Inc. v. Shalala,* 85 F.3d 211, 215 (5th Cir.1996) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (citation omitted)).

 When, as here, the case does not turn on sophisticated Plan interpretation issues, the Court is not required to apply the two-step process of *Wildbur* described above. *See Duhon v. Texaco, Inc.,* 15 F.3d 1302, 1307 n. 3 (5th Cir.1994) ("However, the reviewing court is not rigidly confined to this two-step analysis in every case."); *Rigby v. Bayer Corp.,* 933 F.Supp. 628, 631–32 (E.D.Tex.1996) (eschewing the two-step inquiry of *Wildbur* and asking simply

whether the Administrator abused its discretion). In this case, the Court is not being called upon to determine the correct interpretation of the Plan. This case, instead, turns upon whether there was substantial evidence to support the denials of benefits. On this issue, the Court finds the summary judgment evidence clearly supports the Plan Administrator's decision as to both Plaintiffs.

After a careful review of the evidence, the Court concludes that Plaintiffs have failed to demonstrate a genuine issue of material fact as to whether the Plan Administrator abused his discretion when he found Plaintiffs ineligible to receive benefits. The plan provides disability for a covered employee who has become "incapacitated." "Incapacitated" is defined in the plan as:

wholly and continuously unable by reason of physical or mental health impairment, in the judgment of … the employer, 1. to perform any work suitable to the person's capabilities, training and experience, that the person's employer has available during the first two years of any one period in which the person's health is physically or mentally so impaired. 2. to perform any work for compensation or profit for which the person is or may become reasonably fitted by education, training or experience during the remainder of such a period of health impairment.

*Def,'s Mot. for Summ. J. Ex. A, Affidavit of Thomas C. Harrison,* ¶ 6.

Further, the employer may deny benefits if in the employer's judgment, in the case of a person's disability, the person did not "follow instructions as to treatment."

---

**2.** The abuse-of-discretion standard is the equivalent of the arbitrary or capricious standard. *See Wildbur,* 974 F.2d at 635 n. 7 (noting no substantive difference between "abuse of discretion" and "arbitrary and ca-

pricious" standards); *Salley,* 966 F.2d at 1014 ("In applying the abuse of discretion standard, we analyze whether the plan Administrator acted arbitrarily or capriciously.").

*See Def.'s Mot. for Summ. J. Ex. E, Disability Plan, at 12.* Sufficient evidence exists to support the Plan Administrator's determination that Plaintiffs were not incapacitated or did not follow instructions as to treatment.

## A. *Plaintiff Schaffer*

■ Defendant denied Plaintiff's request for medical retirement benefits on July 31, 1997. *Plaintiff's Mot. for Summ. J., Ex. R, Letter from Michael Schmidt to Blair Brininger.* The portion of the administrative record presented to the Court indicates that the following information regarding Plaintiff's medical condition was before the Plan Administrator when the decision was made: (1) an October 9, 1996 letter from Plaintiff's treating physician, Dr. Pyle, describing Plaintiff's condition and outlining Plaintiff's work restrictions, *Plaintiff's Mot. for Summ. J., Ex. E;* (2) two "Medical Impairment Certification Forms" completed by the Medical/Health Services department of Exxon, *Plaintiff's Mot. for Summ. J., Exs. G, H;* and (3) a letter from Dr. Richard O. Dockins, Director of the Medicine and Environmental Health Department to Mrs. Gloria Uroda of Exxon Risk Management, *Plaintiff's Mot. for Summ. J., Ex. P.* Dr. Pyle's letter and the Medical Impairment Certification Forms indicate that Plaintiff had a medical condition requiring certain work restrictions on what physical activities Plaintiff could perform. The documents generally agree, but contain some differences. Dr.

Pyle indicated that Plaintiff could not engage in lifting, pulling, or pushing over ten pounds. One of the Medical Impairment Certificate forms places the limit at forty pounds. *Plaintiff's Mot. for Summary J., Ex. H.* The Exxon documents classify Plaintiff as "partially impaired." Dr. Pyle made no such explicit finding.

Dr. Dockins' letter relates the following events. Plaintiff was instructed to enter into a "work hardening program" in May of 1997. *Plaintiff's Mot. Summ. J., Ex. P, at 1.* Plaintiff refused to participate until he was examined by his physician. *Id.* At this point Plaintiff changed doctors from Dr. Pyle to Dr. Gable in Houston. *Id.* Dr. Gable prescribed a "work hardening program" as well, and Plaintiff began it on June 2, 1997. *Id.* Plaintiff then reported on June 11, 1997 that he had injured his back on June 6 during the program. *Id.* Dr. Dockins examined Plaintiff the next day and determined that there was no significant back injury and that Plaintiff's refusal to participate was the result of lack of motivation. *Id.*[3]

In light of this evidence, the Court has no basis for concluding that the denial of benefits was arbitrary and capricious. Indeed the evidence does not create a genuine issue of material fact on the issue. The only additional evidence of Plaintiff's medical condition was provided to Defendant almost two years later on July 25, 1999.[4] This occurred almost ten months

---

3. Dr. Dockins reports encountering Plaintiff, immediately before the meeting, "on the phone leaning (apparently comfortably) on a counter with his weight on his left leg with his right leg crossed in front." *Id.*

4. The letter was misdated as April 23, 1997. Plaintiff admits this was a clerical mistake. The evidence submitted to Defendant on July 25, 1999 includes notes of Dr. Donald T. Lazaraz who examined Plaintiff on four occasions. In the first visit, on June 26, 1997, Dr.

Lazaraz diagnosed Plaintiff with possible rheumatoid spondylitis of the lumbar spine. *Plaintiff's Mot. For Summ. J., Ex. Q.* He recommended an exercise program. In a note written after a second visit on October 3, 1997, Dr. Lazaraz opined that Plaintiff was not capable of returning to gainful employment and found that he was not a candidate for retirement. *Plaintiff's Mot. For Summ. J., Ex. S.* In a note written after a follow-up visit less than a month later on October 31, 1997,

after Plaintiff's employment had been terminated on September 23, 1998 for failing to participate in the work transitioning program or to provide additional medical documentation. *Plaintiff's Mot. for Summ. J., Ex. U, Letter from Hancock to Schaffer.*

■ Plaintiff is allowed to supplement the administrative record by submitting it to the administrator "in a manner which gives the administrator a fair opportunity to consider it." *Vega,* 188 F.3d at 300. Here, Plaintiff submitted the additional evidence approximately nine months before filing suit. Nevertheless, the Plan requires that Plaintiff appeal a denial of benefits decision within ninety days after receiving notice of the denial. *See Plaintiff's Mot. for Summ. J. Ex. A, Plan Brochure, at 30.* Here, the additional documents were not submitted until two years after the denial.

■ In something of a last ditch effort, Plaintiff presents a set of correspondences that he claims demonstrates an intention on the part of Defendant to deny him his benefits regardless of the evidence he would present. These correspondence include: (1) an e-mail between employees of the Plan Administrator, dated March 3, 1997, stating that Plaintiff "should be back at work obtaining proper medical care or terminated." *Plaintiff's Mot. for Summ. J. Ex. J, E–Mail from Kathleen Hannaman to Pamela Taylor;* (2) unsigned, undated handwritten notes listing reasons for denying Plaintiff's claims. *Plaintiff's Mot. for Summ. J. Ex.ZB, Handwritten Notes,* *Undated;* (3) an e-mail between employees of the Plan Administrator, dated November 17, 1999, proposing reasons to deny Plaintiff's claims. *Plaintiff's Mot. for Summ. J. Ex. V, E–Mail from Taylor to Apolta Beasley;* (4) an e-mail, dated April 17, 1997, stating that Exxon was not planning to disability retire Plaintiff, *Plaintiff's Mot. for Summ. J. Ex. M, E–Mail from Jim Bowen to Human Resources;* and (5) an e-mail which anticipates litigation, thereby recognizing, according to Plaintiff, that the denial had no basis. *Plaintiff's Mot. for Summ. J. Ex.K, E–Mail from Taylor to Hannaman.*

Having reviewed the foregoing correspondences, the Court finds that they cannot support an inference that Defendant intended to deny Plaintiff's claims regardless of the evidence Plaintiff would present. Indeed, some of these correspondences were written well after the decision to deny benefits was made.

■ Plaintiff also suggests that Defendant imposed a condition not contained in the Plan by allegedly denying his claim for not undergoing surgery. As evidence, Plaintiff offers the notes of Dr. Pyle which state that Defendant told him they were denying Plaintiff's claim because he did not do everything in his power, such as surgery, to improve his condition. *Plaintiff's Mot. for Summ. J. Ex. N, Notes of Dr. Pyle dated April 29, 1997.* None of the correspondence from Defendant to Plaintiff, however, suggests that Plaintiff must undergo surgery. Indeed, Defen-

Dr. Lazaraz noted that a blood test had confirmed that Plaintiff had arthritis. He recommended an exercise program and prescribed medicine. *Plaintiff's Mot. For Summ. J., Ex. T.* In a fourth note, written after a follow-up visit almost one year later on October 12, 1998, Dr. Lazaraz opined that Plaintiff's injuries to his elbow were the result of repetitive motion aggravated by arthritis. He diag-

nosed Plaintiff with a whole body impairment of nineteen percent. *Plaintiff's Motion for Summ. J., Ex. W.* Although the first three notes were written well before Plaintiff was terminated on September 23, 1998, Plaintiff never submitted any of this evidence to Defendant until much later, despite Defendant's repeated requests.

dant required Plaintiff to participate in a work-hardening program. The evidence does not support Plaintiff's claim.

■ Finally, Plaintiff suggests that Defendant abused its discretion by denying Plaintiff's benefits when it had no jobs available that Plaintiff could do. The work-hardening program, however, was intended to be Plaintiff's job. *Plaintiff's Mot. for Summ. J. Ex.O, Letter from Hancock to Plaintiff* (characterizing the work-hardening program as Plaintiff's "job"). As noted above, Plaintiff refused to participate and there was sufficient evidence to support Defendant's conclusion that Plaintiff was able to participate.

For the reasons stated above, the Court concludes that with regard to whether Defendant acted arbitrarily and capriciously in denying Plaintiff's benefits, there is no genuine issue of material fact regarding Plaintiff's claim and that Defendant is entitled to judgment as a matter of law. Accordingly, Defendant's Motion is **GRANTED.** Plaintiff's Motion for Summary Judgment is **DENIED.** Plaintiff's claims are hereby **DISMISSED WITH PREJUDICE.**

### B. *Plaintiff Stiefel*

■ Plaintiff Stiefel's claim for medical retirement benefits was denied on August 5, 1997. *Plaintiff's Mot. for Summ. J., Ex. P, Letter from Schmidt to Brininger.* The basis for the denial was that Plaintiff "continues to progress and is entering a therapeutic program with the intent of returning to work." *Id.* Plaintiff sent, the next day, a notice that he would appeal the decision. *Plaintiff's Mot. for Summ. J., Ex. ZA, Letter from Brininger to Schmidt.* The appeal was denied by the Plan Administrator in a letter dated December 29, 1997, on the ground that Plaintiff was "still an employee" and hence "not eligible for any retirement benefits." *Plaintiff's Mot.*

*for Summ. J., Ex. I Letter from Hannaman to Brininger.* On January 20, 1999, more than one year later, Plaintiff's counsel sent Defendant a letter expressing a desire to appeal once again the denial of benefits. *Plaintiff's Mot. for Summ. J., Ex. S, Letter from Brininger to Hannaman.* Along with the letter were attached various documents. In addition, Plaintiff obtained a fully favorable decision from the Social Security Administration regarding his disability, and this was forwarded to Defendant on April 23, 1999. *Plaintiff's Mot. for Summ. J., Ex. E, Letter from Brininger to Hannaman.* Nevertheless, Plaintiff's second appeal was denied on May 24, 1999, on the grounds that Plaintiff was not terminated due to disability. *Plaintiff's Mot. for Summ. J., Ex. U, Letter from McGurk to Brininger.* According to the Plan Administrator, Plaintiff's employment was terminated because he did not contact the employer as requested when he failed to return to work. *Id.* In a final letter, the Plan Administrator again refused to reverse the decision "based on additional medical information that was not provided at the time of [Plaintiff's] examination to determine his ability to return to work, during the almost two months between that examination and the day he was to report to work[,] or at the time of his termination of employment." *Plaintiff's Mot. for Summ. J., Ex. G, Letter from Harrison to Brininger.* The Court concludes that Plaintiff's failure to return to work following being certified to return to work, in light of Dr. Kemp's impairment evaluation at nine percent, justified Plaintiff's termination and denial of benefits. *Defendant's Mot. for Summ. J., Ex. C, Impairment Evaluation of Dr. Kemp.* Given Dr. Kemp's evaluation, Defendant had a basis for concluding that Plaintiff was not incapacitated as required to be eligible for disability benefits. Be-

cause the Court cannot re-weigh the evidence, the Court cannot conclude that the Plan Administrator's decision was arbitrary and capricious even in light of the evidence Plaintiff later submitted. *See Rougeau v. Bellsouth Telecomm., Inc.,* 1997 WL 299367, *4 (E.D.La. June 4, 1997) (noting that the Court may not re-weigh evidence before the plan administrator).

The Court adds that the fact that Plaintiff received an award of benefits from the Social Security Administration does not mean that the Plan Administrator abused his discretion in denying disability benefits. *See Milson v. St. Luke's Episcopal Hosp.,* 71 F.Supp.2d 634, 639 n. 2 (S.D.Tex.1999) (Holding that plan administrator did not abuse discretion by making determination which conflicted with Social Security Administration decision to award disability benefits); *Anderson v. Operative Plasterers' and Cement Masons' International Assoc. Local No. 12 Pension and Welfare Plans,* 991 F.2d 356 (7th Cir. 1993); *Madden v. ITT Long Term Disability Plan for Salaried Employees,* 914 F.2d 1279, 1286 (9th Cir.1990) ("[I]f Madden's argument were correct, ERISA fiduciaries would be stripped of all administrative discretion, as they would be required to follow the Department of Health and Human Services' decisions regarding Social Security benefits, even where the Plan determines benefits under different standards or the medical evidence presented is to the contrary.").

■■■ Like Plaintiff Schaffer, Plaintiff Stiefel attempts, as a last-ditch effort, to demonstrate that Defendant abused its discretion by planning to deny Plaintiff's benefits regardless of the evidence. In the case of Plaintiff Stiefel, the evidence for this plot consists of (1) an undated, unsigned handwritten list of proposed reasons to deny Plaintiff's claims, *Plaintiff's Mot. for Summ. J. Ex.ZB, Handwritten Notes, Undated,* and (2) e-mails sent on November 17, 1999 discussing reasons to deny Plaintiff's claims, *Plaintiff's Mot. for Summ. J. Ex. V, E–Mail from Taylor to Beasley.* The undated, unsigned list cannot constitute competent evidence. It is not clear when the list was written, who wrote it, or in what context it was written. In addition, the e-mails fail to establish Plaintiff's point as they were sent well after the decision to deny benefits was made.

Finally, Plaintiff suggests that Defendant had no jobs available that Plaintiff could perform, and hence it was an abuse of discretion for it to deny his benefits. As indicated above, however, there was sufficient evidence to support the Plan Administrator's conclusion that Plaintiff could return to work, and Plaintiff did not comply after being instructed to do so.

For all the reasons stated above, the Court concludes that with regard to whether Defendant acted arbitrarily and capriciously in denying Plaintiff's benefits, there is no genuine issue of material fact regarding Plaintiff's claim and that Defendant is entitled to judgment as a matter of law. Accordingly, Defendant's Motion is **GRANTED**. Plaintiff's Motion for Summary Judgment is **DENIED**. Plaintiff's claims are hereby **DISMISSED WITH PREJUDICE**.

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is **GRANTED**. Plaintiffs' Motions for Summary Judgment are **DENIED**. Accordingly, the claims of Plaintiff Schaffer and Plaintiff Stiefel are **DISMISSED WITH PREJUDICE**. Each party is to bear its own costs and attorney's fees in the matter incurred herein to date.

**IT IS SO ORDERED.**

## FINAL JUDGMENT

For the reasons set forth in the Order issued this date, Defendant's Motion for Summary Judgment is hereby **GRANTED**, and Plaintiffs' Motions for Summary Judgment are **DENIED**. Accordingly, Plaintiffs' claims against Defendant are **DISMISSED WITH PREJUDICE**. All parties are **ORDERED** to bear their own costs and attorney's fees incurred herein to date. **THIS IS A FINAL JUDGMENT.**

**IT IS SO ORDERED.**